GORDON SILVER
GERALD M. GORDON, ESQ.
Nevada Bar No. 229
E-mail: ggordon@gordonsilver.com
TALITHA B. GRAY, ESQ.
Nevada Bar No. 9040
E-mail: tgray@gordonsilver.com
3960 Howard Hughes Pkwy., 9th Floor
Las Vegas, Nevada 89169
Telephone (702) 796-5555
Facsimile (702) 369-2666
[Proposed] Attorneys for TAWK Development, LLC

E-Filed On 1/17/11

## UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF NEVADA

| In re:<br><br>TAWK DEVELOPMENT, LLC,<br><br>Debtor. | Case No.: 11-10584-MKN<br>Chapter 11<br><br><br>Date:  OST Pending<br>Time:  OST Pending |
|---|---|

### OMNIBUS DECLARATION OF MICHAEL S. TALBOTT IN SUPPORT OF DEBTOR'S FIRST DAY MOTIONS

I, Michael S. Talbott, hereby declare as follows:

1. I am the manager of TAWK Development, LLC ("Debtor") and am over the age of 18 and am mentally competent. I make this Declaration in support of TAWK Development, LLC's (the "Debtor") first day motions.[1]

2. Except as otherwise indicated, all of the facts set forth in this Declaration are based upon my personal knowledge of Debtor's operations and finances, information learned from my review of relevant documents, and information supplied to me by other members of Debtor's management team and Debtor's business and legal advisors. If called upon to testify as to the content of this Declaration, I could and would do so.

A. **Debtor's Ownership And Operations.**

3. Debtor is a Nevada limited liability company that is owned by: (i) TMF Investments, LLC, a California limited liability company; (ii) Scott Keller; and (iii) Leroy D.

---

[1] All undefined, capitalized terms shall have the meaning ascribed to them in the Debtor's respective first day motions filed contemporaneously herewith.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102578-002/1104397.doc

Wilder, Trustee of The Wilder Family Trust dated May 17, 1996. I am the sole manager of Debtor.

4.  Debtor owns and operates the 198-unit resort style apartment complex known as Falcon Landing, which is located at 5067 Madre Mesa Drive in Las Vegas, Nevada (the "Property"). Falcon Landing offers four floor plans: (i) the Cirrus, which is a 633 sq. ft., 1 bedroom, and 1 bathroom apartment; (ii) the Chancellor, which is a 748 sq. ft., 1 bedroom, and 1 bathroom, with a loft apartment; (iii) the Pilatus, which is a 1,081 sq. ft., 2 bedrooms, and 2 bathrooms apartment; and (iv) the Piaggio, which is a 1,074 sq. ft., 2 bedrooms, and 2 bathrooms, with a loft apartment.

5.  Falcon Landing offers tenants a gated resort style living community, with: (i) an elegant clubhouse complete with furniture, a flat screen television, a wet bar, and vending; (ii) wi-fi surrounding the club house; (iii) bbq areas; (iv) a dog park; (v) garages, RV and boat parking; and (vi) a resort style pool area complete with a heated pool with a waterfall, a spa, showers, and vending.

6.  Construction of Falcon Landing commenced in 2007, at the onset of the economic recession, and was completed in 2009, at the height of the recession. Falcon Landing began leasing its units in or about November of 2008, and despite the dire economic climate, on the Petition Date, 87% of Falcon Landing's units were leased.

7.  In order to finance the construction of Falcon Landing, on or about April 10, 2007, Debtor entered into a Construction Loan Agreement (the "Loan Agreement") with Lender,[2] thereby authorizing Debtor to borrow up to $20 million (the "Loan").[3] The Loan is evidenced by that certain Secured Promissory Note (the "Note") dated April 12, 2007, in favor of Lender in the principal sum of $20 million, together with accruing interest.[4]

---

[2] The term "Lender" refers to Aviva Real Estate Investors (Falcon Landing), LLC, a limited liability company, as successor in interest to Aviva Life and Annuity Company f/k/a Amerus Life Insurance Company.

[3] The Loan Agreement, Note, Deed of Trust, Assignment, Escrow Security Agreement, Financing Statement, Loan Modification Agreement, First Deed of Trust Modification, and Second Deed of Trust Modification (all as defined herein) are attached as exhibits to the Stipulation Authorizing Use Of Cash Collateral And Granting Adequate Protection, which has been filed contemporaneously herewith.

[4] The second paragraph of Section 1 of the Note provides in relevant part that: "Beginning on the Closing Date [,

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102578-002/1104397.doc

2


8. The obligations due and owing under the Note are secured in part by that certain Construction Deed of Trust, Security Agreement and Assignment of Rents made by Debtor in favor of Lender (the "Deed of Trust"), dated April 10, 2007 and recorded on April 12, 2007 in Book 20070412 as Document No. 0003485 of the Office of the County Recorder of Clark County, Nevada, thereby granting Lender, as more fully set forth in the Deed of Trust, a first lien upon the real property upon Falcon Landing is located, as well as all of the improvements constructed thereon (the "Encumbered Real Property").

9. The obligations due and owing under the Note are further secured by that certain Assignment of Leases and Rents dated April 10, 2007 and recorded on April 12, 2007 in Book 20070412 as Document No. 0003486 of the Office of the County Recorder of Clark County, Nevada (the "Assignment"). The Assignment provides, as more fully set forth therein, that Debtor absolutely and directly assigns,[5] bargains, sells, transfers, conveys, sets over, and delivers to Lender all of its rights under the: (i) leases, license agreements, and concession agreements set forth on the certified rent roll previously provided by Debtor to Lender, and (ii) all other leases, tenancies, rental agreements, license agreements, concession agreements, subleases, and guarantees of the performance or obligation of any tenants thereunder affecting the Property (collectively, the "Leases"), as well as all amendments, extensions, and renewals thereof, together with all rents, other income, or payments (the "Rents") that become due and owing under such Leases or on account of a use of the Property (collectively, the "Encumbered Personal Property," and together with the Encumbered Real Property, the "Collateral").

_____ (continued)
which was April 12, 2007,], interest shall accrue on the amount of the principal balance outstanding hereunder from time to time at the rate of six and twelve one-hundredths percent (6.12%) per annum ('Interest Rate') and shall be paid on the first day of each calendar month from and after the date hereof." The third paragraph of Section 1 of the Note further provides in relevant part that: "Beginning on April 1, 2009, principal and interest shall be due and payable in installments of One Hundred Twenty-one Thousand Four Hundred Fifty-seven and 45/100 ($121,457.45), with an installment in a like amount due and payable on the same day of each month thereafter continuing to and including March 1, 2012." As discussed more fully herein, the Note further authorizes Lender to either declare the Note due and payable or to adjust the per annum interest rate.

[5] Debtor contends and reserves all rights to assert that pursuant to Chapter 107A of the Nevada Revised Statutes, the alleged absolute assignment of all Leases and Rents (as defined herein) solely provides a security interest to Lender and not the enhanced rights that an absolute assignment would have compelled.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102578-002/1104397.doc

3

10. On April 10, 2007, Lender filed a UCC-1 financing statement, document number 2007012405-8, with the Nevada Secretary of State (the "Financing Statement").

11. Debtor's obligations under the Loan Agreement are guaranteed by Scott Keller, Karen Keller, Cindy Talbott, Leroy D. Wilder, The Leroy and Nancy Wilder Trust, and me (collectively, the "Guarantors," and the documents effectuating the guarantees, the "Guarantees").

12. As a result of the economy's impact on Debtor's revenues and its ability to refinance and/or service its debts, as well as the dramatic reduction in market interest rates, on or about December 22, 2009, Lender and Debtor entered into that certain Loan Modification Agreement with an effective date of July 1, 2009, whereby certain terms of the Loan Agreement, Deed of Trust, Escrow Agreement, Note, and Guarantees were modified, including but not limited to the Loan repayment terms. Specifically, the third paragraph of Section 1 of the Note, which is quoted in relevant part herein in footnote 4, was replaced with the following:

> Beginning on April 1, 2009, principal and interest shall be due and payable in installments of One Hundred Twenty-one Thousand Four Hundred Fifty-seven and 45/100 Dollars ($121,457.45) continuing to and including the June 1, 2009 payment. On July 1, 2009 continuing to and including the July 1, 2010 payment, interest only payments shall be due and payable in equal, consecutive installments of One Hundred One Thousand Six Hundred Seventy-two and 83/100 Dollars ($101,672.83). Beginning on July 1, 2010, principal and interest will be due and payable in installments of One Hundred Twenty-one Thousand Four Hundred Fifty-seven and 45/100 Dollars ($121,457.45), with an installment in a like amount due and payable on the same day of each month thereafter continuing to and including March 1, 2012. Lender shall have the right to declare this Note to be due and payable in full on the Call Date or to adjust the per annum interest rate on the Rate Adjustment Date to an interest rate established by Lender ('Adjusted Interest Rate') as herein provided. In the event Lender elects to declare this Note to be due and payable, this Note shall become due and payable, in full, without a Make Whole Premium on March 1, 2012 ('Call Date'). In the event Lender elects to adjust the interest rate, then on March 1, 2012 ('Rate Adjustment Date') the per annum interest rate shall be adjusted to the Adjusted Interest Rate and commencing on April 1, 2012, monthly installments of principal and interest shall be due and payable in an amount determined by amortizing the then principal balance of this Note over a 27-year term at the Adjusted Interest Rate, and a like amount shall be due and payable on the same day of each month thereafter until said principal and interest shall be paid, except that all remaining principal and interest to the date of payment shall be due and payable on April 1, 2017 or such earlier date resulting from acceleration of the Indebtedness by Lender ('Maturity Date').

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102578-002/1104397.doc

4

13. Concurrently therewith, Debtor also executed that certain Modification of Construction Deed of Trust, Security Agreement and Assignment of Rents (the "<u>First Deed of Trust Modification</u>") dated December 21, 2009 with an effective date of July 1, 2009 and recorded on December 21, 2009 as Instrument No. 200912310001740 in the Office of the County Recorder of the Clark County, Nevada.

14. Thereafter, Lender and Debtor further confirmed certain terms of the Deed of Trust through the Confirmation and Modification Agreement (the "<u>Second Deed of Trust Modification</u>," and together with the Deed of Trust and the First Deed of Trust Modification, the "<u>Modified Deed of Trust</u>") dated and recorded on February 4, 2010 as Instrument No. 201002040003073 in the Office of the County Recorder of Clark County, Nevada, including that: (1) the interest rate from the Loan Conversion Date (as defined in the Loan Documents) through the maturity date is 6.12%; and (2) subject to the terms and conditions of Lender's Election Notice, Rate Set Deadline, Call Date, and Rate Adjustment Date previously discussed herein, the Loan maturity date under the Note and Modified Deed of Trust is April 1, 2017.

15. As of the Petition Date, Debtor's principal obligation outstanding under the Note was $19,935,848.74 on account of principal, and $755,768.04 on account of contract interest.[6]

16. Debtor's revenue is derived primarily from the leasing of its apartment units. In 2010, Debtor generated gross revenue of approximately $2,052,000.

17. Debtor is cash-flow positive prior to debt-service. For the period of January 1, 2010 through December 31, 2010, Debtor's revenues exceeded its operating expenses, leaving more that $914,000 in net revenue before debt service.

18. Moreover, for the three-month period of the Petition Date through March 31, 2011, Debtor has proposed a budget that anticipates generating revenue in the approximate aggregate sum of $203,877 after payment of all operating expenses.

19. On the Petition Date, Debtor had cash and cash equivalents located on the Property and/or in its various bank accounts in the approximate sum of $86,420, as well as an

---

[6] Additional accrued and unpaid default interest, fees, costs, and expenses that may be asserted by Lender are not included in the foregoing figures as they are subject to dispute.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102578-002/1104397.doc

5

additional approximate $2,001 held in its ATM and Falcon ATM Account. None of these sums were under Lender's control.

A. **Emergency Motion For Interim Approval Of Stipulation Authorizing Use Of Cash Collateral By Debtor And Granting Adequate Protection And Scheduling A Final Hearing To Approve Stipulation Authorizing Use Of Cash Collateral By Debtor (The "Cash Collateral Motion").**

20. Debtor's immediate use of Cash Collateral and Disputed Cash Collateral is essential to its on-going operation and ability to reorganize. Debtor cannot meet its on-going postpetition obligations unless it has the immediate ability to use Cash on Hand, the Deposits Accounts, and the Postpetition Cash. In the absence of such use, immediate and irreparable harm will result to Debtor, its estate, and its creditors and will render an effective and orderly reorganization of Debtor's business impossible. An integral aspect of maintaining Debtor's business operations is Debtor's ability to use Cash on Hand, the Deposits Accounts, and the Postpetition Cash to maintain a sufficient level of working capital in order to pay ordinary course obligations such as those to its employees, vendors, utilities, taxing authorities, and to pay for necessary ordinary course property maintenance and projects.

21. Debtor has an emergency need for use of the Cash Collateral and Disputed Cash Collateral in accordance with the Budget attached to the Cash Collateral Stipulation, and, through the Cash Collateral Motion, requests Court authorization on an emergency interim basis for such use in order to avert an immediate closure of its business, which requires use of all such Cash Collateral and Disputed Cash Collateral for operations. The Budget was formulated after review of Debtor's normal and ordinary course cash needs in the operation of its business and has Lender's approval.

22. As applied to the case at hand, Lender is the only party with a properly perfected security interest in Cash Collateral and Disputed Cash Collateral (to the extent determined to be Cash Collateral), and Lender consents to Debtor's use thereof, subject to the terms and conditions set forth in the Stipulation. Debtor and Lender negotiated the Cash Collateral Stipulation at arms' length and in good faith. The Cash Collateral Stipulation is in the best interests of Debtor and its estate.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102578-002/1104397.doc

6

23. The Cash Collateral Stipulation allows for the use of both Cash Collateral and Disputed Cash Collateral in accordance with the Budget attached to the Cash Collateral Stipulation while preserving Debtor and Lender's claims regarding the Cash Collateral and Disputed Cash Collateral. The Cash Collateral Stipulation allows Debtor to effectively operate and maintain its business during the Chapter 11 Case and is essential to an effective reorganization.

24. As of the Petition Date, Debtor believes that the value of its business will not diminish provided Debtor's business continues to operate in the ordinary course and the expenditure of capital expenditures as proposed in the Budget and present management remain in place.

25. An integral aspect of maintaining Debtor's relationships and its business operations is Debtor's ability to use Cash Collateral and Disputed Cash Collateral to maintain a sufficient level of working capital in order to pay ordinary course obligations such as those to its employees, vendors, and taxing authorities, and to pay for necessary ordinary course property maintenance and projects.

B. **Emergency Application For Order Authorizing Maintenance Of Prepetition Cash Management System And Maintenance Of Prepetition Bank Accounts (The "Cash Management Application").**

26. To manage its business efficiently and seamlessly, Debtor utilizes a cash management system (the "Prepetition Cash Management System") to collect and transfer funds generated by its operations and disburse those funds to satisfy the obligations required to operate its business.[7] Specifically, Debtor holds the following interrelated bank accounts (collectively, the "Bank Accounts") at City National Bank:

(1) The Falcon Revenue Account (xxxx6819). This is an e-deposit account into which Debtor's tenants' rental payments tendered in the form of checks and money orders are deposited. The e-deposit provides significant benefits to Debtor, including the

---

[7] For clarity, Debtor's accounts relating to the daily operation of Falcon Landing are denominated under "Falcon," while accounts addressing non-day to day operational matters, such as remaining construction obligations, are denominated under "TAWK."

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102578-002/1104397.doc

7

ability to capture the images and transaction information of checks accepted for payment, schedule automatic payments by tenants from their accounts, and to deliver the information electronically and without banking hour restrictions to City National Bank where the checks can be immediately processed, which minimizes fees, provides expedited access to the funds, and provides an efficient means of managing such deposits and preparing reports. The Southern Nevada Regional Housing Authority, which subsidizes the rental obligations of certain of Debtor's tenants, utilizes this account to tender monthly payments to Debtor.

(2)     <u>The Falcon Credit Card Account (xxxx6827).</u> This is an account established in conjunction with various credit card companies, thereby permitting Debtor's tenants' rental payments to be tendered in the form of debit card and credit card payments.

In addition to the burden in terms of time and expense involved in closing and reopening accounts, the closure of the Falcon Revenue Account and the Falcon Credit Card Account will unquestionably wreak havoc on Debtor's ability to collect its monthly rent from its tenants, which could seriously impair Debtor's ability to successfully reorganize to the detriment of Debtor's creditors.

(3)     <u>The TAWK Operating Account (xxxx6797) and the Falcon Operating Account (xxxx6800).</u> All outgoing payments tendered by Debtor are made from one of these two accounts. The Falcon Operating Account is similar to an impressed bank account, where funds are transferred from the Falcon Credit Card Account and the Falcon Revenue Account to cover expenses being tendered. Only a minimal balance is maintained in this account.

(4)     <u>The Falcon ATM Account (xxxx6835).</u> Debtor offers usage of an ATM to its tenants. The funds from the Falcon ATM Account are utilized to fund the ATM. When a withdrawal is made from the ATM, the withdrawn amount is deducted from the user's account and transferred to the ATM Account.

(5)     <u>Certificate Of Deposit ("CD").</u> Debtor holds a $50,000 CD, which CD serves as security for Debtor's line of credit.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102578-002/1104397.doc

8

27. As previously stated, Debtor's primary source of revenue is derived from the leasing of its units. Some of Debtor's tenants pay their bills by means of debit cards and/or credit cards. Thus, Debtor also has merchant accounts with various credit card companies, such as Discover, Visa, MasterCard, and American Express, which are processed through merchant accounts (the "Merchant Accounts") with Bank of America.

28. It would take a substantial amount of time to obtain new Merchant Accounts from the credit card companies. Hence, if Debtor is not permitted to continue to use the Merchant Accounts as Debtor-in-Possession, it could not offer its tenants the service of allowing them to pay their bills by credit cards for whatever period of time it would take for Debtor to obtain new Merchant Accounts. The absence of credit card services would materially and adversely affect Debtor's business.

29. As of the Petition Date, customer drafts relating to such credit cards were in various stages of collection. To obviate the disruption that might otherwise occur in the collection process, it is in the best interest of Debtor's estate to be authorized to continue to their ordinary course credit card transactions, rather than to close these accounts and then open new accounts.

30. To require Debtor to dismantle or alter their Cash Management System, close its existing Bank Accounts and reopen new accounts, and to seek to transfer its CD that serves as security for Debtor's credit line would result in an extensive expenditure of time and resources and would cause significant disruption and harm to Debtor's ability to efficiently and effectively manage its operations, as well as to reorganize.

31. Debtor's Cash Management System is an ordinary, usual, and important business practice. The Cash Management System enables Debtor to maintain control over the receipt and disbursement of cash, and to generate timely and accurate financial information critical to managing during the pendency of this Chapter 11 Case. If these practices and procedures are disrupted, Debtor's efforts to reorganize may be jeopardized.

32. Establishing a new cash management system would entail unnecessary delay and cost. At a minimum, substantial disruptions to Debtor's business would occur by, among other

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102578-002/1104397.doc

9

things, disrupting Debtor's ability to collect its monthly rental revenue through automatic electronic payments deposited into Debtor's e-deposit account and payments tendered by credit cards and debit cards. Additionally, the closing of accounts may result in delay of receipt of the automatic monthly payment from the Southern Nevada Regional Housing Authority. Moreover, closing and opening new accounts may result in delaying payments to employees and vendors. This would in turn harm trade creditors, employee loyalty, and would hinder Debtor's chances to successfully reorganize.

33. Further, maintaining the Cash Management System would not prejudice any party. Debtor will maintain strict records with respect to all transfers of cash so that it is able to readily account for all transactions. Debtor's maintenance of its existing Cash Management System is not only of importance to Debtor's business operations, but is also in the best interest of Debtor's estate and its creditors.

C. **Emergency Motion Pursuant To 11 U.S.C. §§ 105(a) And 366 For An Order Determining That Adequate Assurance Has Been Provided To The Utility Companies (The "Utility Motion").**

34. In the ordinary course of its business, Debtor incurs utility expenses for water, sewer service, electricity, gas, telephone and internet service, and waste management. These utility services are provided by the utilities (as such term is used in Section 366, collectively, the "Utility Providers") including, but not limited to those listed on Exhibit "2" to the Utility Motion.

35. On average, Debtor spends approximately $19,500 to $22,500 each month on utility costs. As of the Petition Date, Debtor was substantially current[8] on utility payments (as set forth in the Utility Service List) that came due before the Petition Date.

36. Preserving utility services on an uninterrupted basis is essential to Debtor's ongoing operations and, therefore, to the success of its reorganization. Any interruption of utility services, even for a brief period of time, would disrupt Debtor's ability to continue servicing its

---

[8] For all utilities billed monthly, Debtor believes that it has paid all of its received invoices for services rendered through November 2010 with the sole exception of its sewer service provided by the City of Las Vegas. For all utilities billed quarterly, Debtor believes it has paid all of its received invoices for services rendered through the first three quarters of 2010.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102578-002/1104397.doc

10

tenants, thereby negatively impacting such relationships, revenues, and profits. Such a result could jeopardize Debtor's reorganization efforts and, ultimately, Debtor's value and creditor recoveries. It is therefore critical that utility services continue uninterrupted during this Chapter 11 Case.

37. Stated otherwise, discontinuation of utility service, particularly the telephone, internet, and waste management service that Debtor provides to each of its tenants, would cause significant disruption to Debtor's operations and could put Debtor's reorganization efforts in jeopardy.

38. Debtor intends to pay postpetition obligations owed to the Utility Providers in a timely manner. Debtor expects that it will have ample liquidity, based upon cash on hand and cash flow from operations, to pay its postpetition obligations to its Utility Providers. Specifically, Debtor's operations are currently cash flow positive prior to debt service, and Debtor presently has approximately $88,421 either in cash on hand or in its bank accounts as of the Petition Date.

39. As additional assurance of payment, the following Utility Providers presently hold deposits: (1) NV Energy - $115; (2) Las Vegas Valley Water District - $9,000 surety bond; and (3) Southwest Gas - $210 (collectively, the "Existing Deposits").

40. To provide additional assurance of payment for future services to the Utility Providers, Debtor has allocated the collective sum of $11,000 (representing approximately one half of month's average utility expense) to be made available from Debtor's cash flow for payment of utility deposits (the "Utility Deposit Reserve"). The Utility Deposit Reserve will provide still further assurance of future payment, over and above the Debtor's ability to pay for future utility services in the ordinary course of business based upon their existing cash on hand and cash flow from operations (collectively with the Existing Deposits and the Utility Deposit Reserve, the "Proposed Adequate Assurance"). Debtor submits that the Proposed Adequate Assurance provides protection well in excess of that required to grant sufficient adequate assurance to the Utility Providers.

. . .

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102578-002/1104397.doc

11

D. **Emergency Application For Order Permitting Debtor To Honor Security And Technology Deposits (The "Deposits Application").**

41. As of the Petition Date, tenants and prospective tenants had placed security deposits for units they intend to or presently occupy (the "Security Deposits"), as well as deposits for media-related equipment, such as television receivers (the "Tech Deposits," and together with the Security Deposits, the "Deposits").

42. Maintaining the satisfaction and goodwill of prospective tenants and existing tenants is imperative to the success of any reorganization by Debtor. If Debtor is unable to honor its Security Deposits and Tech Deposits, it will loose the goodwill and loyalty of its tenants and its operations will be severely affected. Further, an inability to honor Deposits would likely irreparably harm Debtor's relationship with the Southern Nevada Regional Housing Authority, which provides subsidies to assist Las Vegas residents to meet their rental obligations.

43. The relief requested in the Deposits Application is in the best interests of Debtor's estate, as it will have little, if any, economic impact on Debtor's creditors, while preserving for the creditors invaluable goodwill. It is necessary that this Court grant the relief requested in the Deposits Motion in order to facilitate continued operation of Debtor's business and Debtor's tenants' loyalty and continued rental of its technology services and the Property.

44. As of the Petition Date, Debtor estimates that it is holding Security Deposits of approximately $68,119.00 and Tech Deposits of approximately $3,466.99.

I declare under penalty of perjury of the laws of the United States that these facts are true to the best of my knowledge and belief.

DATED this 12th day of January, 2011.

/s/ Michael S. Talbott
MICHAEL S. TALBOTT

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102578-002/1104397.doc

12